UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| THE METHODIST HOSPITALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:11-cv-036 |
| | ) | |
| FTI CAMBIO, LLC, HEALTHNET | ) | |
| SYSTEMS CONSULTING, INC., | ) | |
| CLIFTON JAY, and MEDICAL | ) | |
| INFORMATION TECHNOLOGY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Methodist Hospitals believes it has suffered "in excess of $16 million" in compensatory damages as a result of being sold glitchy software that was supposed to revolutionize the day-to-day operations of its hospitals and healthcare facilities. As a result, it has filed a complaint against four defendants: 1) FTI Cambio, the healthcare management company that Methodist hired to provide consulting services; 2) HealthNET Systems Consulting, a healthcare information technology consulting firm that FTI Cambio hired on behalf of Methodist; 3) Clifton Jay, the president of HealthNET; and 4) Medical Information Technology ("Meditech"), which created the allegedly glitchy software. The Complaint alleges that FTI Cambio, HealthNET, and Jay all wrongfully induced Methodist to purchase the software and that Meditech breached its contract with Methodist by failing to ensure proper implementation of the software.

These defendants have taken different tacks in responding to the Complaint: Meditech has answered, FTI Cambio has filed a motion to dismiss [DE 44], and HealthNET and Jay

1

together have tried to piggyback on FTI Cambio's motion by filing a "Motion for Leave to Adopt FTI Cambio LLC's Motion to Dismiss" [DE 56]. As explained in more detail below, these motions will be granted in part and denied in part.

## FACTUAL BACKGROUND

Methodist operates hospitals and outpatient healthcare facilities in northwest Indiana. During the 1990s, Methodist entered into various loan agreements that were funded through revenue bonds. The loans stated that if Methodist failed to meet various financial covenants it was required to hire an independent "turnaround" consultant to make recommendations regarding Methodist's continued operations. These covenants were triggered in 2006, at which point Methodist hired FTI Cambio as the independent consultant and the two parties entered into a "Turnaround Support Services Agreement." The Turnaround Agreement required FTI Cambio to provide professional services that would help Methodist increase its revenue and reduce its costs. As part of the turnaround process, FTI Cambio officials also became the CEO and the CFO of Methodist. As alleged in Methodist's complaint, FTI Cambio assumed a vital role in the Methodist's operations: "In their capacities as Independent Consultant, CEO, and CFO, Cambio and its employees were charged with directing, supervising and implementing all operations of the Hospital, all of which were to be undertaken with the best interests of the Hospital as its ultimate responsibility." [DE 1 at 9.]

FTI Cambio then hired HealthNET to conduct an assessment of Methodist's information technology system. Methodist already had a healthcare information software system called Epic, which it had purchased in 2004 and which it was in the process of implementing. According to the Complaint, however, FTI Cambio, HealthNET, and HealthNET's President Clifton Jay

concluded that "Epic was a larger, more complicated, and more expensive system than Methodist needed" and thus recommended that "Methodist discontinue implementing the Epic Software and, instead, purchase and implement a health care information system designed by Meditech." [DE 1 at 10.]

In 2007, HealthNET prepared a due diligence report for Methodist that ultimately concluded that there would be significant overall cost savings in moving from the Epic software to the Meditech software. FTI Cambio then recommended that Methodist hire HealthNET to serve as the implementation consultant in charge of implementing the Meditech software. Before making the final decision to switch to the Meditech software, Methodist discussed the software with Meditech employees to ensure that it would function properly with Methodist's existing security and antivirus protocols, some of which were mandated by federal laws regarding the protection of patient records. Methodist alleges it was assured that the software would function properly.

Ultimately, Methodist agreed to switch to the Meditech software by first entering into a "Software Agreement" with Meditech and then also entering into an "Implementation Agreement" with HealthNET. From there, at least as it is told by Methodist in its Complaint, the story turns into a cascade of software horrors: as the software was implemented, computers began to freeze, crash, display incorrect information, inaccurately record patient information, and produce superfluous screens, menus, submenus, and options. These glitches "engendered widespread frustration and confusion among Methodist physicians and staff as well as unworkable inefficiencies in Methodists operations," so much so that the Methodist's Medical Council (comprised of various physicians at the hospital) voted unanimously in April of 2009 to

3

"terminate the Meditech system and pursue another system." [DE 1 at 18.] In May of 2009, Methodist's Board of Directors voted to terminate the Meditech implementation.

Four months prior to that termination vote, Methodist and FTI Cambio entered into a confidential "Settlement Agreement and Mutual Release," dated January 5, 2009. The relationship between Methodist and FTI Cambio had evidently soured and a dispute arose about the amount of fees Methodist owed to FTI Cambio for its consulting services. FTI Cambio claimed that it was owed a seven-figure amount, but Methodist disputed that calculation.[1] In any event, they resolved their differences, signed a settlement agreement whereby Methodist agreed to pay approximately 55% of the amount FTI Cambio claimed it was owed, and both sides walked away with a mutual release. For reasons explained more fully below, this agreement is potentially quite significant: FTI Cambio believes it gets them out of this case. Relatedly, HealthNET/Jay want access to the settlement agreement, presumably to see what hay they can make of it.

**DISCUSSION**

Methodist's Complaint has seven counts against the four defendants: Count 1) breach of fiduciary duty against FTI Cambio; Count 2) breach of the Turnaround Agreement against FTI Cambio; Count 3) fraud against HealthNET and Jay regarding the representations about the implementation and maintenance of the Meditech software, along with vicarious fraud against FTI Cambio; Count 4) breach of the Implementation Agreement against HealthNET; Count 5) negligence against FTI Cambio, HealthNET, and Jay; Count 6) breach of the Software

---

[1]The settlement agreement is confidential and has been filed in this case under seal. Thus, throughout this opinion I try as mush as possible to refer to the terms of the agreement only in a general way.

Agreement against Meditech; and Count 7) fraudulent inducement against Meditech.

FTI Cambio first claims that all four counts brought against it (Counts 1, 2, 3 and 5) should be dismissed because Methodist did not tender to FTI Cambio the consideration it received for the release it previously signed, which Indiana law requires as a condition precedent to bringing this action and which thus violates Rule 9(c)'s requirement that a plaintiff allege that it has met all conditions precedent. Second, FTI Cambio argues for dismissal of Count 3 on the grounds that Methodist has not pled fraud with sufficient particularity in violation of Rule 9(b) and for the dismissal of Count 1 (breach of fiduciary duty) on the grounds that it "sounds in fraud" and has also failed to meet Rule 9(b)'s requirement. Finally, FTI Cambio claims that Methodist has not made sufficiently plausible fraud allegations that would state a cognizable claim under Rule 12(b)(6).

For their part, HealthNET and Jay have responded in a puzzling way: they have neither answered the Complaint nor moved to dismiss. Instead, they filed a motion to "adopt" FTI Cambio's Motion and in doing so they essentially parrot FTI Cambio's arguments while also tacking on an argument that Count 5 (negligence) "sounds in fraud" and has not met Rule 9(b)'s standards. HealthNET and Jay do add cryptically that, if their adoption approach doesn't work, they want to file their own motion to dismiss specific to Jay. [*See* DE 57 at 7.] But that procedural maneuver to get two bites at the apple won't fly; I am construing their Motion to Adopt as a Motion to Dismiss. And in doing so, it's worth pointing out that by adopting FTI Cambio's motion, HealthNET makes no attack on Count 4 of the Complaint. This is because FTI Cambio did not move to dismiss Count 4 since that count does not pertain to FTI Cambio. Thus, as it now stands, by merely adopting FTI Cambio's arguments, HealthNET has neither

answered nor otherwise pled to Count 4 of the Complaint.

**I. The Prior Settlement Agreement and Condition Precedent Under Rule 9(c)**

FTI Cambio's first argument depends on the Settlement Agreement and Mutual Release entered into between Methodist and FTI Cambio in January of 2009. When the relationship between FTI Cambio and Methodist began to sour, the smell of litigation must have been in the air. Evidently, at the center of the dispute was how much money Methodist owed FTI Cambio. The parties resolved their dispute (as least as it relates to fees) with Methodist paying FTI Cambio a portion of the amount FTI Cambio claimed it was owed. For its part, Methodist claims – and the Settlement Agreement confirms – that the amount of the debt was totally in dispute.

A release is not typically at issue in a motion to dismiss; instead, in answering the complaint a defendant will ordinarily invoke "release" as an affirmative defense, which is exactly what Rule 8(c) requires. *See* Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: . . . release . . . ."); *Deckard v. Gen. Motors Corp.*, 307 F.3d 556, 561 (7th Cir. 2002) (release is an affirmative defense). There are some rare instances where it is appropriate to consider an affirmative defense before a responsive pleading is filed, namely where the complaint so unmistakably establishes the presence of a defense that the suit is rendered frivolous. *Walker v. Thompson*, 288 F.3d 1005, 1009-10 (7th Cir. 2002). And occasionally courts will just transmute a 12(b)(6) motion that raises an affirmative defense into a 12(c) motion, which is evaluated under the same standards. *McCready v. eBay, Inc.*, 453 F.3d 882, 892, n.2 (7th Cir. 2006) ("Although it is incorrect to grant a motion to dismiss under Rule 12(b)(6) on the basis of an affirmative defense, resolution is appropriate here as a judgment on the pleadings under Rule 12(c).").

Following these principles, Methodist argues that FTI Cambio must raise the release as an affirmative defense and that its reliance on the release at this point is therefore premature. But this reasoning fails to take seriously the more idiosyncratic way in which FTI Cambio is invoking the release here. At this point, FTI Cambio is not arguing that the substance of the release precludes Methodist from stating a claim – an argument that would indeed seem to be premature. Instead, FTI Cambio makes a more subtle three-step argument concerning the release. Here's how the argument goes: First, FTI Cambio claims that Methodist's Complaint is necessarily seeking "to avoid [the] release" [DE 49 at 8] – i.e., to proceed with claims that the release could otherwise bar. Second, citing Indiana cases, FTI Cambio asserts that any party seeking to avoid a release must first, as "a condition precedent," return the consideration it was offered when it entered into the release. Finally, because Methodist has failed to allege that it returned the consideration it received, it has thus failed to comply with Rule 9(c)'s requirement that a party must allege "that all conditions precedent have occurred or been performed." Fed. R. Civ. P. 9(c).

There is a certain syllogistic, chrome-finish ingenuity to this argument. But after taking the "return-of-consideration" theory for a test-drive through the common law, I can't help but see the corrosion around its edges. In short, this case is simply ill-suited for application of the return-of-consideration paradigm.

First off, while the parties focus their attention on just a handful of Indiana cases, the return-of-consideration principle is known more generally as the "tender-back" doctrine and is actually "one of the most elementary principles of contract law," namely "that a party may not rescind a contract without returning to the other party any consideration received under it."

7

*Fleming v. U.S. Postal Service AMF O'Hare*, 27 F.3d 259, 260 (7th Cir. 1994). "It is the same with a release, which after all is just another contract" and therefore it is "a general principle of contract law" that "a release can be rescinded only upon a tender of any consideration received." *Id.* Justice Thomas has underscored the principle's basic simplicity: "The tender back doctrine requires, as a condition precedent to suit, that a plaintiff return the consideration received in exchange for a release, on the theory that it is inconsistent to bring suit against the defendant while at the same time retaining the consideration received in exchange for a promise not to bring such a suit." *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 436-437 (1998) (Thomas, J. dissenting).

Despite this doctrine's superficial ease, however, it has numerous provisos and exceptions that have long beguiled courts – so much so that fifty years ago another district court analyzing the principle found "the cases from all jurisdictions . . . in hopeless disagreement." *Taxin v. Food Fair Stores, Inc.*, 197 F. Supp. 827, 831 (D.C. Pa. 1961). An exhaustive (and exhausting) American Law Report on the doctrine – originally published in 1941 and now stretching, with updates, to some 209 pages – concluded:

> The courts have apparently been unwilling to apply the principle universally to all the possible legal situations in which questions as to the avoidance of a release or settlement may arise and to all the varying circumstances and equities presented by individual cases, and consequently a number of well-recognized exceptions, limitations, qualifications, and modifications of the rule have arisen.

Annot., 134 A.L.R. 6 (1941).

Maryland's highest court helpfully categorized a number of these exceptions in a 1966 case:

> The general rule is . . . that one who seeks to rescind a contract or to have equity rescind it must restore to the other party the consideration that was given by that

> party, but there are a number of exceptions to the rule. . . . Equity will in an appropriate case order rescission without restoration if: (1) the performance by the one against whom rescission is sought has become worthless, or (2) the respondent has prevented its return, or (3) the performance conferred only an intangible benefit upon the complainant, or (4) only a promise was given, or (5) the complaint can properly retain it irrespective of the voidable transaction, or (6) it is in possession of or is subject to the order of a person having a right superior to the complainant, or (7) restoration is impossible for some reason not hereinbefore mentioned and the clearest and strongest equity demands that rescission be granted (sometimes with a monetary substitute for restoration).

*Funger v. Mayor and Council of Town of Somerset*, 223 A.2d 168, 173-74 (Md. 1966).

Exceptions three and four in this list – instances where the consideration at issue is "an intangible benefit" or "only a promise" – invoke an important distinction in the tender-back caselaw between tangible and intangible consideration. That is, there's a long-standing, often implicit assumption of the tender-back rule: it is limited to cases "where one party to the contract has received goods, money, or other thing of value, which is capable of being returned to the other party." *Timmerman v. Stanley*, 51 S.E. 760, 762 (Ga. 1905) (refusing to apply tender-back rule to a private teaching contract because "there would be no possible way by which such instruction as he had given could be returned or tendered back to him"). *See also Citizens' St. R. Co. v. Horton*, 48 N.E. 22, 25 (Ind. Ct. App. 1897) (quoting *Mullen v. Old Colony R. Co.*, 127 Mass. 86 (Mass. 1879)) ("It is well established that if a party enters into a contract, and in consideration of so doing *receives money or merchandise*, and afterwards seeks to avoid the effect of such contract as having been fraudulently obtained, he must first give back to the other party the consideration received.") (emphasis added).

This principle goes unstated in the Indiana cases cited by FTI Cambio, but with good reason: in each of those cases the plaintiff seeking to avoid the release had received tangible property that could have actually been returned. *Monnier v. Central Greyhound Lines*, 129

9

N.E.2d 800, 803 (Ind. Ct. App. 1955) (release executed in exchange for $1,585); *Lazarrus v. Employers Mut. Cas. Co.*, 364 N.E.2d 140, 140 (Ind. Ct. App. 1977) (release executed in exchange for $4,481.57); *Prall v. Indiana Nat. Bank*, 627 N.E.2d 1374, 1379 (Ind. Ct. App. 1994) (money advanced on a $230,000 loan to a partnership in which plaintiff was a partner); *Midwest Lumber and Dimension, Inc. v. Branch Banking and Trust Co.*, 2007 WL 2757270, at *8 (S.D. Ind. Sept. 20, 2007) (money advanced on a line of credit); *Sturgis v. AuthorHouse*, 2008 WL 679100, at *2 (S.D. Ind. Mar. 12, 2008) (settlement payment of $1,699.00). And, as the *Prall* court emphasized, when a party has actually received cold, hard cash or tangible property, there is a certain logic to requiring its return prior to litigation:

> Without this rule an unscrupulous releasor would be under no duty to restore the consideration he received and, being subject only to the possibility of having it set off against any judgment he might recover, could use the very money he received in compromise to prosecute subsequent action and, if unsuccessful therein, force the releasee to further protracted and expensive legal action for the attempted recovery thereof.

*Prall*, 627 N.E.2d at 1379.

This tangible/intangible distinction is particularly relevant here because Methodist only received *intangible* consideration in the settlement and release agreement. The agreement arose out of a dispute over the amount of money Methodist owed FTI Cambio for its consulting services. FTI Cambio asserted it was a seven-figure amount; Methodist disputed that calculation. So, they entered into a garden-variety settlement agreement to resolve the dispute. FTI Cambio received as its consideration for that agreement 1) payment of a portion of that disputed amount and 2) Methodist's promise not to pursue any claims related to the Turnaround Agreement; in exchange, Methodist received 1) FTI Cambio's corresponding promise not to pursue any claims related to the Turnaround Agreement (including claims for the rest of the

10

disputed amount). Thus, the only consideration Methodist received was a promise not to be sued by FTI Cambio – an intangible benefit and a prototypical exception to the tender-back rule. *See, e.g., Funger*, 223 A.2d at 173-74 (listing "an intangible benefit" and "only a promise" as exceptions).

In a last-ditch salvo, FTI Cambio floats out a contorted argument that Methodist has actually received tangible consideration that could (and must) be returned. In FTI Cambio's world, Methodist "received" a large amount of cash in the settlement – the amount it "received" when it got to keep the difference between the amount FTI Cambio claimed it was owed for its services and the amount Methodist actually paid in the settlement agreement. But this argument ignores the fact that the original dispute between Methodist and FTI Cambio involved a disputed, unliquidated amount – at the outset of the agreement, the recitals state that Methodist disputes FTI Cambio's calculation of its fee. Indeed, FTI Cambio's description of the consideration in its reply brief betrays the argument's sleight-of-hand: FTI Cambio argues that Methodist received "a forgiven debt," but what Methodist actually received was "a forgiven *claim* for a *disputed, uncertain* debt." FTI Cambio's relinquishment of this claim for the unliquidated amount was, by itself, the necessary and sufficient consideration received by Methodist. *See Hakim v. Payco-General American Credits, Inc.*, 272 F.3d 932, 935 (7th Cir. 2001) ("Forbearance of a right to a legal claim constitutes valid consideration.").

Thus, because Methodist did not receive any "goods, money, or other thing of value" that would be "capable of being returned" to FTI Cambio, *Timmerman*, 51 S.E. at 762, the tender-back rule is inapplicable under these circumstances and not a condition precedent to Methodist's claims. FTI Cambio's argument regarding Rule 9(c) will therefore be denied.

## II. Rule 9(b)

FTI Cambio next argues that Methodist's Complaint fails to plead its fraud count with sufficient particularity to meet the standards of Rule 9(b) and that the breach of fiduciary duty count "sounds in fraud" such that it also must conform to Rule 9(b). HealthNET and Jay have glommed onto this argument for the fraud count and have argued that the negligence count also sounds in fraud. I'll start with addressing whether the breach of fiduciary duty and negligence claims sound in fraud.

### A. Breach of Fiduciary Duty and Negligence

The parties dispute whether the first count (breach of fiduciary duty) and the fifth count (negligence) sound in fraud such that they would be subject to Rule 9(b). It is clear that "Rule 9(b) applies to 'averments of fraud,' not claims of fraud, so whether the rule applies will depend on the plaintiffs' factual allegations." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Thus, "[a] claim that 'sounds in fraud' – in other words, one that is premised upon a course of fraudulent conduct – can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

I can see the argument that the breach of fiduciary duty count sounds in fraud, since the count alleges numerous instances where FTI Cambio is purported to have mislead Methodist. But this argument misses the fact that, while any breach of fiduciary duty must necessarily involve some duplicity or neglect, the breach need not rise to the level of intentional fraud for there to be liability. Which is to say that while fraud is an *intentional* tort, a breach of fiduciary duty could arise through negligence and without intent. *Tamari v. Bache & Co.*, 838 F.2d 904, 908 (7th Cir. 1988) (a "breach of fiduciary duty . . . could of course result from negligence . . .");

12

*F.T.C. v. Think Achievement Corp.*, 2007 WL 3286802, at *4 (N.D. Ind. Nov. 5, 2007) (noting that under Indiana law "the elements of breach of fiduciary duty are the same" as negligence, "except that the duty owed and breached must have been a fiduciary one"); *Hotel Des Artistes, Inc. v. Transamerica Ins. Co.*, 1994 WL 263429, at *6, n.5 (S.D.N.Y. Jun. 13, 1994) ("[A] fiduciary's duty can be breached through acts of negligence."); *American Family Mut. Ins. Co. v. Dye*, 634 N.E.2d 844, 847 (Ind. Ct. App. 1994) (construing count in plaintiff's complaint "as a claim for breach of fiduciary duty arising out of a negligent failure to advise").

This distinction between fraud and breach of a fiduciary duty is important for the 9(b) analysis here because "courts generally have held that the periphery of Rule 9(b) lies at the distinction between intentional fraudulent misrepresentations and negligent misrepresentations." *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1041 (N.D. Ill. 2007) (summarizing case law). *See also Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007) (recognizing that heightened pleading standards of Rule 9(b) do not apply to negligent misrepresentation claim); *Kennedy v. Venrock Associates*, 348 F.3d 584, 593 (7th Cir. 2003) (Federal Rule of Civil Procedure 9(b)'s heightened pleading standards does not apply to claims under Section 14(a) of the Securities Exchange Act of 1934 unless those claims charge fraud, as opposed to negligence); *Banta Corp. v. Honeywell Intern., Inc.*, 2006 WL 801008, at *1 (E.D. Wis. Mar. 24, 2006) ("[A] claim of negligent misrepresentation is only a pale simulacrum of a fraud claim, and it is therefore doubtful that such claims were intended to be covered under [Rule 9(b)].").

And here, in fact, Methodist has repeatedly alleged that FTI Cambio's breach of fiduciary duty may have arisen through negligence rather than intentional fraud. *See* DE 1 at 22-25. Thus,

13

I find that Methodist's count for breach of fiduciary duty does not "sound in fraud" such that it would require the application of Rule 9(b). *Cf. Jackson v. N'Genuity Enterprises, Co.*, 2010 WL 4628668, at *2 (N.D. Ill. Nov. 8, 2010) (finding Rule 9(b) inapplicable to breach of fiduciary duty claim); *Nat'l Council on Comp. Ins., Inc. v. Am. Int'l Group, Inc.*, 2009 WL 466802, at * 17 (N.D. Ill. Feb. 23, 2009) (declining to apply Rule 9(b) to breach fiduciary duty claim); *Cement-Lock v. Gas Technology Institute*, 2005 WL 2420374, at *17 (N.D. Ill. Sept. 30, 2005) ("Rule 9(b) does not apply to Plaintiffs' breach of fiduciary duty claim.").

There is one caveat to this analysis, however: the breach of fiduciary duty count does contain one allegation that could only be attributed to intentional fraud. Methodist alleges the following in paragraph 82 of its Complaint: "Cambio also breached its fiduciary duty to Methodist when, in January 2009, Cambio fraudulently induced Methodist to enter into a so-called Settlement Agreement and Mutual Release ("Settlement Agreement") purporting, among other things, to release Cambio from certain potential claims by Methodist." [DE 1 at 23.] This is really a separate claim for fraudulent inducement that has been shoehorned into the breach of fiduciary duty count. The Seventh Circuit is clear that "if both fraudulent and nonfraudulent conduct violating the same statute or common law doctrine is alleged, only the first allegation can be dismissed under Rule 9(b)." *Kennedy*, 348 F.3d at 593. Since this single-paragraph allegation of fraud doesn't come close to meeting the requirements of Rule 9(b), it will be stricken from the Complaint. *See Siegel*, 480 F. Supp. at 1040 ("When an averment of fraud fails to satisfy Rule 9(b), it must be stricken from the complaint."). If Methodist wants to bring a claim for fraudulent inducement against FTI Cambio, it must amend its Complaint to include such a count – and it must ensure that the count is sufficiently detailed to comply with the

14

specifications of Rule 9(b).

As for the negligence count, the same reasoning that applies to the breach of fiduciary duty count applies here as well. Negligence is based on an alleged duty of care and an alleged breach of that duty that proximately causes plaintiff's injuries. It has nothing to do with intentional fraud. *Cf. Decatur Ventures, LLC v. Stapleton Ventures, Inc.*, 373 F. Supp. 2d 829, 848, n.18 (S.D. Ind. 2005) ("Rule 9(b)'s particularity requirement does not apply to Plaintiffs' negligence claim."). So the negligence count is obviously not subject to Rule 9(b)'s heightened pleading requirements.

**B. Fraud against HealthNET and Jay**

On the other hand, Methodist's third count – "Fraud" – is clearly subject to the standards of Rule 9(b). The analysis of this count get a little tricky, however, because the count against FTI Cambio is brought vicariously, based on the alleged direct fraud of its agent, Jay. I'll address the vicarious fraud issue momentarily, but first I'll take up the direct fraud allegations against HealthNET and Jay.

Under Rule 9(b), a party who alleges fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Seventh Circuit has repeatedly described this requirement as the "who, what, when, where, and how" of the fraud – "the first paragraph of any newspaper story." *United States ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009). However, because "courts and litigants often erroneously take an overly rigid view of [that] formulation," the Seventh Circuit as also stated "that the requisite information – what gets included in that first paragraph – may vary on the facts of a given case." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631

15

F.3d 436, 442 (7th Cir. 2011).

I agree with HealthNET and Jay that Methodist's allegations do not meet the Seventh Circuit's standard of "who, what, when, where, and how." It is true that Methodist has sketched the general outlines of a fraud: Clifton Jay is alleged to have made various misrepresentations about the cost of implementing the Meditech software as well as HealthNET and Jay's qualifications to lead the implementation of that software. Whether this was fraud – a knowing and intentional misrepresentation – or merely salesmanship remains to be seen. Fraud usually involves a misrepresentation of fact. *Fimbel v. DeClark*, 695 N.E.2d 125, 127 (Ind. App. 1998). Fraud also occurs when a person fails to disclose all material facts when that person has the duty to disclose. *Id.* But mere expressions of opinion cannot form the basis of a fraud claim. *Shriner v. Sheehan*, 773 N.E.2d 833, 849 (Ind. App. 2002). The case of *Clinton County v. Clements*, 945 N.E.2d 721 (Ind. App. 2011) provides a recent example of that concept. In *Clinton County* the county auditor told the commissioners that new software would cost $200,000 to install. This proved to be wrong, but it was not fraudulent because it was merely a statement of opinion.

In any event, setting aside for the time being whether Methodist has alleged a misrepresentation of fact, its broad sketch of the fraud isn't sufficient to satisfy the particularity requirements of Rule 9(b). For instance, the alleged misrepresentations are almost always attributed either to FTI Cambio, HealthNET, and Jay together, or to Jay and HealthNET together, or to Jay and Cambio together. "A complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient" for purposes of Rule 9(b). *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (quoting *Design Inc. v. Synthetic Diamond Technology, Inc.*, 674 F. Supp. 1564, 1569 (N.D. Ill. 1987)). It might be possible to

16

reconcile Methodist's grouping: in his representations, Jay is alleged to speak for himself, as well as (directly) for the company of which he is the president (HealthNET), and (vicariously) for the company who is alleged to have engaged him as its agent (FTI Cambio). But if that's right then the instances of alleged misrepresentations where only Jay and HealthNet are grouped together or where only Jay and FTI Cambio are grouped together make no sense. HealthNET and Jay cannot reasonably be expected to understand exactly who is alleged to have said what statement, and "in a case involving multiple defendants . . . the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 778 (7th Cir. 1994).

Thus, the fraud count against HealthNET and Jay will be dismissed without prejudice and Methodist will be given leave to amend its Complaint.

### C. Vicarious fraud against FTI Cambio

With respect to FTI Cambio, Methodist alleges that its fraud liability is strictly vicarious, based on the idea that Jay's allegedly fraudulent statements were made while he was acting as FTI Cambio's agent. [DE 1 at 28.] A claim for vicarious fraud is a viable cause of action. *See*, *e.g.*, *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 565–66 (1982) ("[A] principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agent acts with apparent authority."). But since the underlying fraud claim against HealthNET and Jay will be dismissed here, the vicarious fraud claim must also necessarily be dismissed. If Methodist amends its Complaint to include a new vicarious fraud claims against FTI Cambio, however, FTI Cambio should note that a claim for vicarious fraud is governed by Rule 8, not Rule 9(b). *See Guaranty Residential Lending, Inc. v. International Mortg. Center, Inc.*, 305 F.

Supp. 2d 846, 853 (N.D. Ill. 2004) ("An agency relationship establishing vicarious liability for fraud generally does not have to be pleaded with particularity.").

FTI Cambio goes on to argue that there is no plausible reason for FTI Cambio to have engaged in this fraud, and that this lack of plausibility is a fatal flaw under the standards of *Ashcroft v. Iqbal*, ––– U.S. ––––, 129 S.Ct. 1937, 1949 (2009). Again, this argument is mooted by the fact the fraud count will be dismissed. If Methodist amends its Complaint to include a new vicarious fraud claim against FTI Cambio, however, FTI Cambio should note that the plausibility of a defendant's incentives or motive to engage in a fraud would be irrelevant in the context of a claim for *vicarious* fraud.

### III. Disclosure of the Release

The final issue to address here is HealthNET and Jay's request that they be permitted to review the settlement and release agreement between Methodist and FTI Cambio.

As Methodist points out, HealthNET and Jay are less than clear as to the procedural mechanism they believe entitles them to access to the release. Looking at the request with a practical eye, however, it is clear that what they really want is an order to compel the production of the release. But to get such an order, HealthNET and Jay need to go through the steps required by Rule 37(a): "On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a). HealthNET and Jay have not filed such a motion, nor have they confirmed that they attempted to confer with Methodist and FTI Cambio about the disclosure of the release. *See also*

N.D. Ind. Loc. R. 37.1 (requiring certification to state the date, time, and place of the conference or attempted conference and the names of all persons who participated). While it seems likely that ultimately HealthNET and Jay should be entitled to review a copy of the release (presumably pursuant to a protective order), they will not be entitled to any order from this Court directing as much until they have complied the Federal Rules of Civil Procedure and the Local Rules of this District.

## CONCLUSION

Accordingly, FTI Cambio's Motion to Dismiss [DE 44] is **GRANTED** as to Count 3 of Plaintiff's Complaint but is otherwise **DENIED**. HealthNET and Clifton Jay's Motion for Leave to Adopt FTI Cambio's Motion to Dismiss and Request for Disclosure of the Release [DE 56] is **CONSTRUED** as a Motion to Dismiss and is **GRANTED** as to Count 3 but is otherwise **DENIED**. HealthNET and Clifton Jay's Motion for Leave to File Memorandum [DE 70] is **DENIED AS MOOT**. Paragraph 82 of Plaintiff's Complaint is **STRICKEN**. Count 3 of Plaintiff's Complaint is **DISMISSED WITHOUT PREJUDICE**. Methodist is afforded until and including July 29, 2011 to amend it Complaint if it chooses to do so.

**SO ORDERED**.

ENTERED: July 1, 2011

s/ Philip P. Simon  
PHILIP P. SIMON, CHIEF JUDGE  
UNITED STATES DISTRICT COURT